# 15-3885(L), 15-3886(XAP)

# United States Court of Appeals

*for the*

# Second Circuit

FOX NEWS NETWORK, LLC,

*Plaintiff-Appellee-Cross-Appellant,*

– v. –

TVEYES, INC.,

*Defendant-Appellant-Cross-Appellee.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## REDACTED PAGE PROOF BRIEF FOR
## DEFENDANT-APPELLANT-CROSS-APPELLEE

THOMAS C. RUBIN
QUINN EMANUEL URQUHART
   & SULLIVAN, LLP
600 University Street
Suite 2800
Seattle, WA 98101
(206) 905-7000

KATHLEEN M. SULLIVAN
TODD ANTEN
JESSICA A. ROSE
QUINN EMANUEL URQUHART
   & SULLIVAN, LLP
51 Madison Avenue
22nd Floor
New York, New York 10010
(212) 849-7000

*Attorneys for Defendant-Appellant-Cross-Appellee*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1, TVEyes, Inc. states that it has no parent corporation, and no publicly held corporation owns 10 percent or more of its stock.

# TABLE OF CONTENTS

**Page**

RULE 26.1 CORPORATE DISCLOSURE STATEMENT........................................i

TABLE OF AUTHORITIES .................................................................iv

PRELIMINARY STATEMENT ............................................................1

JURISDICTION.................................................................................2

ISSUES PRESENTED..........................................................................3

STATEMENT OF THE CASE................................................................3

    A.     Statutory Background.................................................................3

    B.     Fox's Copyrighted Works ..........................................................4

    C.     TVEyes' Business Model.............................................................6

          1.     TVEyes' Searching Function...........................................9

          2.     TVEyes' Viewing Function .............................................11

          3.     TVEyes' Archiving Function............................................13

          4.     TVEyes' E-mailing Function ...........................................13

          5.     TVEyes' Downloading Function .......................................14

          6.     TVEyes' Date/Time-Search Function ..................................14

    D.     The Alleged Infringement ..........................................................15

    E.     Proceedings Below ...................................................................16

          1.     The September 9, 2014 Order...........................................17

          2.     The August 25, 2015 Order .............................................19

          3.     The November 6, 2015 Order...........................................22

SUMMARY OF ARGUMENT ...............................................................22

STANDARD OF REVIEW ...................................................................24

ARGUMENT ..................................................................................24

I.     TVEYES' E-MAILING, DOWNLOADING AND DATE/TIME-SEARCH FUNCTIONS ARE PROTECTED FAIR USES ..........................24

     A.    The E-mailing, Downloading And Date/Time-Search Functions Are Transformative Uses ....................................26

          1.    E-mailing Function ....................................29

          2.    Downloading Function ...............................32

          3.    Date/Time-Search Function ......................34

     B.    The Works Are Factual In Nature And Were Previously Published ....................................37

     C.    The Works Are Used Only In A Limited And Targeted Way ...........40

     D.    The E-mailing, Downloading And Date/Time-Search Functions Do Not Harm The Market For The Works ...........................41

          1.    E-mailing Function ....................................43

          2.    Downloading Function ...............................49

          3.    Date/Time-Search Function ......................50

          4.    The E-mailing, Downloading And Date/Time-Search Functions Provide Important Public Benefits ..........................51

II.    UNDER *CABLEVISION*, TVEYES IS NOT LIABLE FOR DIRECT COPYRIGHT INFRINGEMENT ....................................52

III.   THE DISTRICT COURT ABUSED ITS DISCRETION IN ISSUING A PERMANENT INJUNCTION ....................................56

     A.    The District Court Failed To Consider The *eBay* Factors .................56

     B.    Fox Cannot Satisfy The *eBay* Test ....................................57

     C.    The Injunction Is Overbroad ....................................59

CONCLUSION ....................................60

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) ....................................62

# TABLE OF AUTHORITIES

**Page**

<u>Cases</u>

*A&M Records, Inc. v. Napster, Inc.*,
    114 F. Supp. 2d. 896 (N.D. Cal. 2000)..........................................................33

*ACORN v. United States*,
    618 F.3d 125 (2d Cir. 2010) .........................................................................24

*Ali v. Fed. Ins. Co.*,
    719 F.3d 83 (2d Cir. 2013) ...........................................................................24

*Am. Geophysical Union v. Texaco Inc.*,
    60 F.3d 913 (2d Cir. 1994) ...........................................................................33

*Am. Inst. of Physics v. Winstead PC*,
    No. 12-cv-1230, 2013 WL 6242843 (N.D. Tex. Dec. 3, 2013) ............. 31, 32

*American Broadcast Companies, Inc. v. Aereo, Inc.*,
    134 S. Ct. 2498 (2014)..................................................................................55

*Apple Inc. v. Samsung Elecs. Co.*,
    695 F.3d 1370 (Fed. Cir. 2012) ....................................................................57
    735 F.3d 1352 (Fed. Cir. 2013) ....................................................................59

*Authors Guild v. Google, Inc.*,
    804 F.3d 202 (2d Cir. 2015) ................................................................ *passim*

*Authors Guild, Inc. v. HathiTrust*,
    755 F.3d 87 (2d Cir. 2014) ...............................................17, 25-27, 37, 40-42

*A.V. ex rel. Vanderhye v. iParadigms, LLC*,
    562 F.3d 630 (4th Cir. 2009) ................................................................. 27, 28

*Beastie Boys v. Monster Energy Co.*,
    87 F. Supp. 3d 672 (S.D.N.Y. 2015) ............................................................60

*Bill Graham Archives v. Dorling Kindersley Ltd.*,
    448 F.3d 605 (2d Cir. 2006) ................................................. 27, 41-42, 45, 51

*Caldwell Mfg. Co. N. Am., LLC v. Amesbury Grp., Inc.*,
    No. 11-cv-6183, 2011 WL 3555833 (W.D.N.Y. Aug. 11, 2011) ................58

*Campbell v. Acuff-Rose Music, Inc.*,
  510 U.S. 569 (1994)............................................................. 4, 37, 42, 45, 51

*Capitol Records, LLC v. ReDigi, Inc.*,
  934 F. Supp. 2d 640 (S.D.N.Y. 2013) ...........................................32

*Cariou v. Prince*,
  714 F.3d 694 (2d Cir. 2013) ................................................. 26, 38

*Cartoon Network LP, LLLP v. CSC Holdings, Inc.*,
  536 F.3d 121 (2d Cir. 2008) ................................................2, 3, 22, 23, 52-56

*Castle Rock Entm't, Inc. v. Carol Publ'g Grp., Inc.*,
  150 F.3d 132 (2d Cir. 1998) ....................................................4, 41

*Chi. Bd. of Educ. v. Substance, Inc.*,
  354 F.3d 624 (7th Cir. 2003) .......................................................60

*Christopher Phelps & Assocs., LLC v. Galloway*,
  492 F.3d 532 (4th Cir. 2007) ......................................................57

*Consumers Union of United States, Inc. v. Gen. Signal Corp.*,
  724 F.2d 1044 (2d Cir. 1983) ......................................................37

*CoStar Grp., Inc. v. LoopNet, Inc.*,
  373 F.3d 544 (4th Cir. 2004) .......................................................53

*Disney Enters., Inc. v. Hotfile Corp.*,
  798 F. Supp. 2d 1303 (S.D. Fla. 2011)...........................................53

*eBay Inc. v. MercExchange, L.L.C.*,
  547 U.S. 388 (2006)............................................. 2, 3, 22, 24, 56, 57

*Ecolab, Inc. v. FMC Corp.*,
  569 F.3d 1335 (Fed. Cir. 2009) ...................................................57

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
  499 U.S. 340 (1991)...................................................................38

*Flava Works, Inc. v. Gunter*,
  No. 10-cv-6517, 2011 WL 1791557 (N.D. Ill. May 10, 2011) ....................53

*Fox Broad. Co. v. Dish Network LLC*,
    747 F.3d 1060 (9th Cir. 2014) ......................................................53

*Harper & Row Pubs., Inc. v. Nation Enters.*,
    471 U.S. 539 (1985)............................................................ 35, 38, 40

*Hearst Stations Inc. v. Aereo, Inc.*,
    977 F. Supp. 2d 32 (D. Mass. 2013) ............................................53

*Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*,
    736 F.3d 1239 (9th Cir. 2013) ................................................ 57, 58

*In re AutoHop Litig.*,
    No. 12-cv-4155, 2013 WL 5477495 (S.D.N.Y. Oct. 1, 2013) ....................52

*INS v. AP*,
    248 U.S. 215 (1918)..........................................................................38

*Kamerling v. Massanari*,
    295 F.3d 206 (2d Cir. 2002) ........................................................57

*Kelly v. Arriba Soft Corp.*,
    336 F.3d 811 (9th Cir. 2002) .......................................................28

*Marobie-FL, Inc. v. Nat'l Ass'n of Fire Equip. Distribs.*,
    983 F. Supp. 1167 (N.D. Ill 1997).................................................53

*Monsanto Co. v. Geertson Seed Farms*,
    561 U.S. 139 (2010)........................................................................56

*New Era Publ'ns Int'l, ApS v. Carol Publ'g Grp.*,
    904 F.2d 152 (2d Cir. 1990) ........................................................37

*New York Times Co., Inc. v. Tasini*,
    533 U.S. 483 (2001)........................................................................32

*NXIVM Corp. v. Ross Inst.*,
    364 F.3d 471 (2d Cir. 2004) ........................................................26

*Parker v. Google, Inc.*,
    242 F. App'x 833 (3d Cir. 2007) .................................................53

*Perfect 10, Inc. v. Amazon.com, Inc.*,
   508 F.3d 1146 (9th Cir. 2007) ............................................................. 28, 42

*Petrella v. Metro-Goldwyn-Mayer, Inc.*,
   134 S. Ct. 1962 (2014)................................................................................58

*Playboy Enters., Inc. v. Russ Hardenburgh*,
   982 F. Supp. 503 (N.D. Ohio 1997) .............................................................53

*Salinger v. Colting*,
   607 F.3d 68 (2d Cir. 2010) .......................................................... 57, 58, 59

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
   464 U.S. 417 (1984).................................................... 37, 47, 50, 54

*Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*,
   756 F.3d 73 (2d Cir. 2014) ............................... 25, 27, 37, 38, 42

*UMG Recordings, Inc. v. MP3.com, Inc.*,
   92 F. Supp. 2d 349 (S.D.N.Y. 2000) ...........................................................33

*United States v. ASCAP*,
   599 F. Supp. 2d 415 (S.D.N.Y. 2009) .........................................................33

*Waldman Publ'g Co. v. Landoll*, Inc.,
   43 F.3d 775 (2d Cir. 1994) .........................................................................60

*White v. West Publ'g Corp.*,
   No. 12-cv-1340, 2014 WL 3385480 (S.D.N.Y. July 11, 2014) ............. 27, 31

*Wolk v. Kodak Imaging Network, Inc.*,
   840 F. Supp. 2d 724 (S.D.N.Y. 2012) .........................................................52

## **Statutes**

17 U.S.C. § 106...........................................................................................29

17 U.S.C. § 107 ................................................................................... *passim*

28 U.S.C. § 1292(a)(1)....................................................................................2

28 U.S.C. § 1331 .............................................................................................2

28 U.S.C. § 1338(a) ................................................................2

28 U.S.C. § 1367 ....................................................................2

## **<u>Other Authorities</u>**

4 NIMMER ON COPYRIGHT § 14.06(B)(1)(c)(ii) .......................................58

## PRELIMINARY STATEMENT

This appeal arises from an order of the District Court for the Southern District of New York (Hellerstein, J.) involving alleged copyright infringement by TVEyes, a media-monitoring service, of certain television programs on stations operated by Fox News Network, LLC ("Fox"). TVEyes is a research tool that transforms television broadcasts into an online database that can be searched by subscribers for research purposes. TVEyes' subscribers include journalists, elected officials, military and law-enforcement officers, academics, and a variety of non-profit and for-profit corporations. All of TVEyes' functions work together to enable subscribers to locate and analyze clips of television broadcasts.

The district court correctly held that TVEyes is protected under the Copyright Act, 17 U.S.C. § 107, in allowing its subscribers to search for, view and archive clips from Fox television programs for research purposes, as each of those activities is a fair use. But the district court inexplicably carved up TVEyes' business model, enjoining TVEyes from allowing its subscribers to e-mail, download or run date/time searches on the very same television clips. That injunction should be vacated, for the three enjoined functions (e-mailing, downloading, and date/time-search) are just as much fair uses as the three permitted functions (searching, viewing, and archiving).

In its opinion supporting the injunction, the district court erred by devising a novel test that asked which of TVEyes' research functions was "integral" to its

service—a test with no basis in the Copyright Act or this Court's precedents. Just as finding, reading and saving a copyrighted opinion on Westlaw serves the same legal-research purposes as e-mailing that opinion to a colleague or downloading it to read on a handheld device, TVEyes' e-mailing, downloading and date/time-search functions are natural extensions of its searching, viewing, and archiving functions—and each and every one of those functions is a fair use. The district court's erroneous analysis warrants vacatur of the injunction.

The district court further erred in holding TVEyes directly liable for its *subscribers'* e-mailing, downloading and date/time searches. This Court's decision in *Cartoon Network LP, LLLP v. CSC Holdings, Inc.* ("*Cablevision*"), 536 F.3d 121 (2d Cir. 2008), forecloses any such result, as TVEyes has no volitional role in its subscribers' conduct.

Finally, the district court abused its discretion in entering an injunction without considering the traditional four-factor equitable test reaffirmed in *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006). Under that test, no injunction is warranted.

## JURISDICTION

The district court had jurisdiction over this matter under 28 U.S.C. §§ 1331, 1338(a) and 1367. This Court has appellate jurisdiction under 28 U.S.C. § 1292(a)(1) over the district court's injunction order dated November 6, 2015 ("Injunction"),

SPA[___-___], and all orders subsumed therein, *see* SPA[___-___] (Opinion and Order dated August 25, 2015 ("Aug.2015.Op.")); SPA[___-___] (Opinion and Order dated November 6, 2015 ("Nov.2015.Op.")). TVEyes filed a timely notice of appeal on December 2, 2015. [Dkt.192.Notice].

## ISSUES PRESENTED

1. Whether TVEyes' e-mailing, downloading, and date/time-search functions—like TVEyes' searching, viewing and archiving functions—are fair uses under the Copyright Act, 17 U.S.C. § 107, because those functions (a) are transformative uses, (b) of copyrighted works that are factual and published, (c) that use only a fraction of the works and (d) cause no market harm to the copyrighted works.

2. Whether TVEyes' e-mailing, downloading, and date/time-search functions involve no volitional conduct supporting direct copyright infringement liability under this Court's decision in *Cablevision*.

3. Whether the injunction order is an abuse of discretion because it (a) fails to undertake any analysis of the traditional four-factor test reiterated in *eBay* and/or (b) is overbroad in scope.

## STATEMENT OF THE CASE

### A. Statutory Background

The fair-use provision of the Copyright Act, 17 U.S.C. § 107, provides in relevant part:

[T]he fair use of a copyrighted work … for purposes such as criticism, comment, news reporting, teaching … scholarship, or research, is not an infringement of copyright.  In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include—

(1) the purpose and character of the use …;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

This provision "'permits and requires courts to avoid rigid application of the copyright statute, when … it would stifle the very creativity which that law is designed to foster.'"  *Castle Rock Entm't, Inc. v. Carol Publ'g Grp., Inc.*, 150 F.3d 132, 141 (2d Cir. 1998) (quoting *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 577 (1994)).

## B.    Fox's Copyrighted Works

Fox operates Fox News Channel ("FNC") and Fox Business Network ("FBN"), both of which air news-oriented content 24 hours a day, 7 days a week. [Dkt.43("Villar.Decl.") ¶¶5, 16].  The vast majority of Fox's revenue from FNC and FBN is derived from:  (1) fees paid to Fox by cable companies that broadcast Fox's content;  and (2) advertising during commercial breaks.    [Sept.2014.Op.9; Dkt.60("Fox.Resp.56.1") ¶94].  Fox also operates a website providing entertainment and news to the public.  [Sept.2014.Op.7; Fox.Resp.56.1 ¶98].  Fox's website makes

available only 16% of content aired on FNC or FBN. [Aug.2015.Op.4; Sept.2014.Op.7; Dkt.49("1st.Misenti.Decl.") ¶13].[1] The video segments that are available on Fox's website differ from prior broadcasts—for example, they are edited to reflect corrections and do not contain a continuous news-update "ticker" scrolling horizontally at the bottom of the screen. [Sept.2014.Op.7; Dkt.54("1st.Seltzer.Decl.") ¶¶47-49].

In addition, directly and through its exclusive licensees ITN Source, Inc. ("ITN Source") and Executive Interviews, Fox licenses previously-broadcast footage to third parties for use in television shows, movies, advertisements, video games, film festivals, e-books and other projects in which the Fox-owned work is publicly performed. [Sept.2014.Op.8; Dkt.68("1st.Anten.Decl.")Ex.JJJ; Dkt.58("1st.Rose.Decl.") ¶¶2-5, Ex.M].



[Sept.2014.Op.8; 1st.Anten.Decl.Ex.KKK.at.ITNSOURCE0000161 §7; Ex.LLL (200:12-203:9); Dkt.138("3d.Rose.Decl.") ¶7, Ex.KKKKK.at.ITNSOURCE0000011 §5.1.1].

---

[1] ████████████████████████████████████████
████████████████████████████████████████ [Sept.2014.Op.7; 1st.Misenti.Decl. ¶13].

███████████████████████████. [3d.Rose.Decl.Ex.KKKKK §2.4].

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████ [1st.Rose.Decl. ¶¶2-3, Ex.M; 1st.Anten.Decl.Ex.LLL (192:12-19)].

Each of the 19 copyrighted video segments at issue here (the "Works")[2] involves news programing, many containing live interviews and video footage owned by networks other than Fox. [1st.Rose.Decl. ¶13, Ex.II; 1st.Anten.Decl.Exs.BBB-1-19]. None of the Works is now available on TVEyes, because TVEyes limits access to the 32 days following an initial broadcast. [1st.Seltzer.Decl. ¶¶5, 42].

## C. TVEyes' Business Model

TVEyes is a media-monitoring service that enables its subscribers to search television and radio broadcasts online in order to conduct research and analysis. [Sept.2014.Op.2; Dkt.53("1st.Ives.Decl.") ¶¶2-3]. TVEyes does this by capturing television and radio content from more than 1,400 channels, 24 hours a day, 7 days a week; creating a comprehensive online, text-searchable database of that content; and allowing subscribers to search for, locate, view, archive, e-mail, and download clips of

---

[2] The 19 Works are: two episodes of *On the Record with Greta Van Susteren*; three episodes of *Special Report with Bret Baier*; three episodes of *The Five*; four episodes of *The O'Reilly Factor*; two episodes of *The Fox Report with Shepard Smith*; four episodes of *Hannity*; and one episode of *Special Report Investigates: Death & Deceit in Benghazi*. [Dkt.1("Complaint") ¶26; 1st.Anten.Decl.Exs.BBB-1-19].

video content in response to their search queries. [Sept.2014.Op.2-3; 1st.Seltzer.Decl. ¶¶2-3; 2d.Seltzer.Decl.¶6]. As the district court noted, "[w]ithout TVEyes, there is no other way to sift through more than 27,000 hours of programming broadcast on television daily, most of which is not available online or anywhere else, to track and discover information." [Sept.2014.Op.25]; *see also* [1st.Ives Decl. ¶5].

TVEyes' service is offered only to businesses for professional use, generally for $500 per month; it is not available to individuals for personal use. [Sept.2014.Op.6; 1st.Ives.Decl. ¶¶6, 16]. As of October 2013, TVEyes had over 2,200 subscribers. [Sept.2014.Op.5; 1st.Ives.Decl. ¶¶10-11, Exs.D-E].[3] Subscribers use TVEyes for a wide variety of research endeavors. For example, journalists use TVEyes to research and criticize broadcast news channels (including FNC and FBN), by comparing how the major networks cover political and other news events. [Sept.2014.Op.26; 1st.Rose.Decl. ¶¶15-25, 27, Exs.KK-UU, WW; 1st.Ives.Decl. ¶10; Fox.Resp.56.1

---

[3] Such subscribers include: (1) journalists and media organizations such as the Associated Press, MSNBC, ▮▮▮▮▮▮▮▮▮▮, and Reuters; (2) government actors such as The White House, over 100 members of Congress and the Department of Defense; (3) U.S. armed services branches including the Army and Marines; (4) law enforcement offices such as the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮; (5) Congressional committees including the House Budgetary Committee and the ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮; (6) political candidates at the local, state, and national levels, as well as political organizations like the ▮▮▮▮▮▮▮▮▮▮▮▮ and the ▮▮▮▮ ▮▮▮▮▮▮▮; (7) public and private schools and libraries; (8) non-profits such as the American Red Cross; and (9) for-profit companies such as ▮▮▮▮▮▮▮▮ ▮▮▮. [1st.Ives.Decl. ¶¶10-11, Exs. D-E].

¶53].  Government officials and corporations use TVEyes to monitor and respond to the accuracy of facts reported by the media.  [Sept.2014.Op.25-26; 1st.Ives.Decl. ¶10; 1st.Anten.Decl.Ex.DDD; Fox.Resp.56.1 ¶¶54, 57].  Political campaigns use TVEyes to monitor political advertising and appearances of candidates and opponents.  [Sept.2014.Op.25-26; 1st.Ives.Decl. ¶10; Dkt.136("4th.Ives.Decl.") ¶6, Ex.ZZZZ; Fox.Resp.56.1 ¶51].  The Army uses TVEyes to track media coverage of military operations to ensure national security and safety of troops.  [Sept.2014.Op.26; 1st.Ives.Decl. ¶10; Fox.Resp.56.1 ¶49].  Financial firms use TVEyes to track and archive public statements made about securities by their employees for regulatory compliance.  [Sept.2014.Op.26; 1st.Ives.Decl. ¶10; Fox.Resp.56.1 ¶48].

TVEyes limits a subscriber's use of its service to research purposes internal to the subscriber's business:  (1) subscribers must physically sign a User Agreement that restricts any use of clips obtained through TVEyes to internal purposes only ([Sept.2014.Op.5; 1st.Ives.Decl. ¶7, Ex.A; Dkt.135-1.Ex.YYYY("Karle.Rep.") ¶¶132-134]); (2) when a subscriber downloads a clip, TVEyes displays a warning that it may be used "for internal review, analysis or research only" and cannot be publicly displayed ([Sept.2014.Op.5; 1st.Ives.Decl. ¶8, Ex.B; Karle.Rep. ¶135]); (3) TVEyes' customer service staff remind subscribers that clips obtained through TVEyes may be used only for internal review, research and analysis ([Sept.2014.Op.5; 1st.Ives.Decl. ¶8, Ex.C; Karle.Rep. ¶¶136-137]); (4) TVEyes' "circuit breakers" prevent subscribers

from playing or downloading multiple consecutive clips, and from widely disseminating clips ([Sept.2014.Op.6; Dkt.75("2d.Seltzer.Decl.") ¶¶15-17; Dkt.137("4th.Seltzer.Decl.") ¶¶12-16; Dkt.72("2d.Ives.Decl.") ¶19]); and (5) when subscribers ask to publicly display clips, TVEyes directs them to the broadcaster for permission ([Sept.2014.Op.5-6; 2d.Ives.Decl. ¶12, Ex.TTT]).

TVEyes' service includes each of the six functions below, which together contribute to the overall utility of TVEyes' research and analysis services:

### 1. TVEyes' Searching Function

Using closed-captioned data and proprietary speech-to-text technology, TVEyes creates transcript "indexes" for every word spoken on a particular television station, and makes that text searchable in an electronic database. [1st.Seltzer.Decl. ¶3]. A TVEyes subscriber begins by selecting and entering the keywords or phrases (which TVEyes calls "Watch Terms") that the subscriber wishes to monitor on an ongoing basis. From that moment on, every time the subscriber logs on TVEyes, the subscriber's customized "Watchlist" page appears. [Sept.2014.Op.3; 1st.Seltzer.Decl. ¶¶7-8]. This page presents the total number of times each day that each Watch Term was mentioned on any of 1,400 television and radio stations over the previous 32 days. [Sept.2014.Op.3; 1st.Seltzer.Decl. ¶¶7-8]. Figure 1 below presents an example (*see* [1st.Seltzer.Decl. ¶¶7-8]):



***Figure 1: Watchlist***

From this Watchlist page, a subscriber can conduct Google News searches and generate and view media statistics for a Watch Term. [Sept.2014.Op.3; 1st.Seltzer.Decl. ¶¶9-10]. The "Media Stats" function, for example, can generate a graphic representation of the number of times a Watch Term has been mentioned over a given time period (*see* [Sept.2014.Op.4; 1st.Seltzer.Decl. ¶11]), and the "Marketshare" function can generate a "heatmap" that depicts the geographic locations and frequencies of Watch Term mentions (*see* [Sept.2014.Op.4; 1st.Seltzer.Decl. ¶12]). From the Watchlist page, a subscriber can also set up an e-mail alert generating an e-mail to the subscriber every time a Watch Term is

mentioned on any television channel, containing a link to a short clip of the mention. [Sept.2014.Op.3; 1st.Seltzer.Decl. ¶¶[14-15].

Content captured and indexed by TVEyes is searchable only for 32 days from the initial broadcast; all content (other than clips specifically archived by subscribers, as discussed below) is deleted from TVEyes' servers 32 days after airing. [Sept.2014.Op.5; 1st.Seltzer.Decl. ¶5].

## 2. TVEyes' Viewing Function

The Watchlist page includes hyperlinked numbers under the heading "Mentions for Date." [Sept.2014.Op.3; 1st.Seltzer.Decl. ¶16]. Clicking on such a number connects a subscriber to a "Results List," where each mention of the Watch Term on that date is listed, along with a snippet of transcript and other factual information about the use. [Sept.2014.Op.3-4; 1st.Seltzer.Decl. ¶16]. Figure 2 below presents an example for the Watch Term "Starbucks" (*see* [1st.Seltzer.Decl. ¶16]):



**Alert Term: Starbucks**   Show Map **6/19/2014**

**Media Filter:** ALL   **Station Filter:** ALL

Zoom **6/19/2014: KOMO-SEA (ABC) - Seattle, WA**   KOMO

**KOMO 4 News 11:00pm**   **News**

**11:11:48 PM:**...>> lilliwop point, going down within five minutes. >> dangerous hoax. the search for the man behind the series of mysterious and costly fake distress calls. >> scholarship or discount? the truth behind on **Starbucks** new employee tuition program. >> stopping cell phone thefts. how tech companies are trying to deter thieves before they strike. >> and i'm steve pool. rain showers are rapidly moving through tonight. also ahead, the impact on your morning commute, and..."

Zoom **6/19/2014: KOVR-SAC (CBS) - Sacramento, CA**   KOVR

**CBS 13 News 10PM**   **News**

**10:44:36 PM:**...>> **Starbucks** is clarifying its offer to get help its workers get an online degree from arizona state university. the company says the scholarship portion consists of a tuition discount. **Starbucks** will not be handing..."

Zoom **6/19/2014: KOVR-SAC (CBS) - Sacramento, CA**   KOVR

**CBS 13 News 10PM**   **News**

**10:41:33 PM:**...so that's one over in 15 holes, so eye just need to get rid of the big numbers. >> stacy lewis is the first round leader with 67 outputs we 11 behind. >> **Starbucks** backlash. why tuition payment for college employees is suddenly drawing criticism...."

Zoom **6/19/2014: KOVR-SAC (CBS) - Sacramento, CA**   KOVR

**CBS 13 News 10PM**   **News**

**10:27:58 PM:**...>> thieves steal a young boys bike. the families desperate plea to get it back. >> and how it took 44 engines to get her to say yes. >> and it sounded like a sweet deal, **Starbucks** paying for college tuition...."

*Figure 2: Results List*

When the subscriber clicks a thumbnail image, a video clip begins to play automatically, accompanied by a snippet of the transcript with the Watch Term highlighted.  [Sept.2014.Op.4; 1st.Seltzer.Decl. ¶18].  The clip begins 14 seconds before the Watch Term is mentioned.  [1st.Seltzer.Decl. ¶18; 1st.Ives.Decl. ¶14].  The subscriber is also provided with information about the clip, including program title,

date and time, channel name, Nielsen market viewership data and data on publicity value.  [Sept.2014.Op.4; 1st.Seltzer.Decl. ¶¶19-20, 31].

Although TVEyes clips are limited to a maximum of ten minutes in length, 95% of all video clips are played for three minutes or less; 91% for two minutes or shorter; and 82% for a minute or shorter.  [Sept.2014.Op.24; 1st.Seltzer.Decl. ¶35; Fox.Resp.56.1 ¶¶69-70].  Fewer than 0.08% of clips are ever played the maximum length.  [Sept.2014.Op.24; 1st.Seltzer.Decl. ¶35; Fox.Resp.56.1 ¶¶69-70].

### 3. TVEyes' Archiving Function

TVEyes permits a subscriber to archive (that is, save) specific clips on TVEyes' system for review at a later date.  [4th.Seltzer.Decl. ¶6; 1st.Seltzer.Decl. ¶19; 4th.Ives.Decl. ¶3].  Because TVEyes' database retains captured content for only 32 days, this function allows subscribers access to clips they may need for research purposes after expiration of that time.  For example, a journalist using a TVEyes clip as source material for a story may need to keep a copy of the clip as a record longer than 32 days.  [Aug.2015.Op.11-12; 3d.Rose.Decl. ¶¶11-16, Exs.OOOOO-TTTTT; 4th.Ives.Decl. ¶¶3-8; Karle.Rep. ¶¶44-46].

### 4. TVEyes' E-mailing Function

TVEyes enables subscribers to send e-mails containing a link to a clip on TVEyes, either by clicking a button on a clip's webpage (the "Email View/Transcript Page" button) or by copying the URL at the top of that page and pasting it into an e-

mail.  [4th.Seltzer.Decl. ¶8.]  This function does not send video files over e-mail, but rather allows subscribers to e-mail a link to the clips they have searched for to others including colleagues in their organizations.  [Aug.2015.Op.13-24; 4th.Ives.Decl. ¶¶9-13; Karle.Rep. ¶¶47-51].

### 5. TVEyes' Downloading Function

A TVEyes subscriber can also download searched-for clips onto the hard drive of a personal computer or other devices to access when no Internet connection is available, the subscriber is not logged onto TVEyes or the subscriber needs to preserve clips along with materials from sources other than TVEyes. [4th.Seltzer.Decl. ¶10; 4th.Ives.Decl. ¶¶14-20; Karle.Rep. ¶¶52-59].  Downloading serves the same purpose as archiving, except that the clip is maintained on the subscriber's computer rather than on TVEyes' servers.  [4th.Ives.Decl. ¶20; Karle.Rep. ¶58].

### 6. TVEyes' Date/Time-Search Function

Finally, rather than searching by keyword, TVEyes subscribers can search for clips broadcast at a particular date and time (within the previous 32 days) on a particular channel.  [1st.Seltzer.Decl. ¶26; 4th.Ives.Decl. ¶21].  This date/time-search function enables a subscriber to conduct research that does not depend on a particular keyword, for example by comparing which stories each of several news channels chose to lead with on their nightly broadcasts, locating the first news channel to

broadcast a particular story or searching for aired graphics or images that cannot be located through a keyword search. In addition, the date/time-search function provides an alternative way to locate a clip when keyword searching fails (for example, because closed captioning mistranscribes a name, posting "Ted Crews" instead of "Ted Cruz"). [4th.Ives.Decl. ¶¶21-26, Ex.BBBBB; Karle.Rep. ¶¶61-67, Exs.5-6; 3d.Rose.Decl.Ex.IIIII].

### D. The Alleged Infringement

During the 32 days each of the 19 Works was searchable on TVEyes, subscribers played clips from the Works just 560 times:

| TVEYES SUBSCRIBERS | VIEWS |
|---|---|
| Political campaigns (national and local) | 145 |
| Journalists/publications | 145 |
| National political party/convention/committee | 88 |
| The White House | 42 |
| Elected officials and staff (senators, congressmen and governors) | 41 |
| Political advocacy group/lobby/super PAC | 28 |
| Policy institute/think tank | 22 |
| Strategic communications/public relations firms | 20 |
| U.S. Military/U.S. Department of Defense | 19 |
| Radio production | 7 |
| State police department | 3 |

[Sept.2014.Op.23; 4th.Seltzer.Decl. ¶5; Fox.Resp.56.1 ¶77]. Of all clips viewed from the Works, 85.5% were viewed for less than one minute; 76% for less than 30 seconds; and 51% for less than 10 seconds. [Sept.2014.Op.23; 1st.Seltzer.Decl. ¶45;

Fox.Resp.56.1 ¶81].  On average, clips from the Works were played for 53.4 seconds.

[Sept.2014.Op.23; 1st.Seltzer.Decl. ¶44; Fox.Resp.56.1 ¶80].

Only six e-mails containing links to clips from the Works were ever sent by

TVEyes subscribers using the "Email View/Transcript Page" button:

| TVEYES SUBSCRIBERS | E-MAILS |
|---|---|
| National political party/convention/committee | 6 |

[4th.Seltzer.Decl. ¶9].  In addition, a total of only 21 clips from the Works were ever

downloaded by subscribers:

| TVEYES SUBSCRIBERS | DOWNLOADS |
|---|---|
| Journalists/publications | 11 |
| Elected officials (U.S. Congress) | 5 |
| Political campaigns | 3 |
| U.S. Department of Defense | 1 |
| PR firm | 1 |

[4th.Seltzer.Decl. ¶11].

### E.    Proceedings Below

On July 30, 2013, Fox filed suit against TVEyes, asserting claims of copyright

infringement of the Works.  *See generally* [Complaint].  After discovery, the parties

cross-moved for summary judgment on, *inter alia*, whether TVEyes' service is a

protected fair use under 17 U.S.C. § 107.[4]

---

[4]    Fox also brought claims of "hot news" misappropriation and "direct competition" misappropriation.  [Complaint ¶¶63-77].  The court granted TVEyes summary

(<em>footnote continued</em>)

### 1. The September 9, 2014 Order

In a September 9, 2014 opinion and order, the district court applied the four statutory fair use factors to TVEyes' service, and concluded that "recording content, putting it into a searchable database and, upon a keyword query, allowing users to view short clips of the content up to 32 days from the date of airing … constitutes fair use." [Aug.2015.Op.8]; *see also* [Sept.2014.Op.12-27].

As to the first factor (nature of the use), the district court recognized that "TVEyes' search engine together with its display of result clips is transformative, and 'serves a new and different function from the original work and is not a substitute for it.'" [Sept.2014.Op.19] (quoting *Authors Guild, Inc. v. HathiTrust* ("*HathiTrust*"), 755 F.3d 87, 96 (2d Cir. 2014)). The court explained that subscribers need to be able to watch clips, and not just read the transcripts, to conduct research on televised content because:

> [t]he actual images and sounds depicted on television are as important as the news information itself—the tone of voice, arch of an eyebrow, or upturn of a lip can color the entire story, powerfully modifying the content. … Subscribers to TVEyes gain access, not only to the news that is presented, but to the presentations themselves, as colored, processed, and criticized by commentators, and as abridged, modified, and enlarged by news broadcasts.

judgment on both ([Sept.2014.Op.28-32]), which Fox does not challenge here ([Case.No.15-3885.Dkt.35-3.Fox.Addendum.B]).

[Sept.2014.Op.17-18]; *see also* [Aug.2015.Op.9] ("TVEyes must be allowed to show clips of the matching video segments"). Further, the court held, "TVEyes' evidence, that its subscribers use the service for research, criticism, and comment, is undisputed and shows fair use." [Sept.2014.Op.20]. And because TVEyes' service is transformative, its for-profit status did not weigh against fair use. [Sept.2014.Op.20].

The district court found the second fair use factor (nature of the copyrighted work) neutral because the Works are "factual or largely informational," and "where the creative aspect of the work is transformed, as is the case here, the second factor has limited value." [Sept.2014.Op.21].

As to the third factor (amount and substantiality of use), while the court recognized that TVEyes copied all of Fox's television content in its entirety, it also recognized that "[t]he value of TVEyes' database depends on its all-inclusive nature," and thus deemed that factor neutral. [Sept.2014.Op.21-22].

Finally, the court concluded that the fourth factor (market effect) favored TVEyes because "[n]o reasonable juror could find that people are using TVEyes as a substitute for watching [Fox] broadcasts on television" ([Sept.2014.Op.24]), Fox was "unable to provide the identity of the customers" its licensors allegedly lost but for TVEyes, and the overall revenue Fox derived from those licenses was in any event "a very small fraction of its overall revenue" ([Sept.2014.Op.25]). Further, the court

found that, "[c]learly, TVEyes provides substantial benefit to the public." ([Sept.2014.Op.26]).

Notwithstanding these findings of fair use as to the searching and viewing features, the district court nonetheless deferred consideration of whether "four complementary features" ([Aug.2015.Op.10])—archiving, e-mailing, downloading, and date/time-search—are fair uses because "[t]he parties have not presented sufficient evidence showing that these features either are integral to the transformative purpose of indexing and providing clips and snippets of transcript to subscribers," or that the archiving, e-mailing, or downloading functions are "threatening to [Fox's] derivative businesses ([Sept.2014.Op.27]).[5]  The parties took discovery and renewed their cross-motions for summary judgment on fair use, limited to these specific issues. [Aug.2015.Op.2].

## 2.    The August 25, 2015 Order

On August 25, 2015, the district court issued an opinion and order holding that TVEyes' archiving function is a fair use but that its e-mailing, downloading, and date/time-search functions are not fair uses.  [Aug.2015.Op.11-18].

*Archiving*:  The court recognized that archiving clips allows subscribers to research subjects such as "the media's changing treatment of a particular story over

---

[5]  The court held that the date/time-search function "does not pose any threat of market harm" to Fox.  [Sept.2014.Op.27].

19

time, and disparities between two networks' treatment of a given topic, [which] are themselves newsworthy." [Aug.2015.Op.12]. The court thus concluded that "[t]he ability to detect these patterns and trends is an essential feature of the transformative service that TVEyes provides," explaining:

> TVEyes' service allows researchers to study [Fox] coverage of an issue and compare it to other news stations; it allows targets of [Fox] commentators to learn what is said about them on the network and respond; it allows other media networks to monitor Fox's coverage in order to criticize it. TVEyes helps promote the free exchange of ideas, and its archiving feature aids that purpose.

[Aug.2015.Op.12]. Further, "Fox has not identified any actual or potential market harm arising from archiving." [Aug.2015.Op.13]. Archiving was thus a "fair use, complementing TVEyes' searching and indexing functions." [Aug.2015.Op.13].

***E-mailing***: The district court recognized that "[t]o prohibit e-mailing of videos would prevent relevant information from reaching the critical party" ([Aug.2015.Op.13]) and "that to prohibit e-mail sharing would prevent TVEyes users from realizing much of the benefit of its transformative service" ([Aug.2015.Op.14]). For example, for members of Congress who subscribe to TVEyes, their interns and staffers are those who use the service, "and then e-mail the results up the chain of command." [Aug.2015.Op.14].

The court held that there is "potential for abuse" of the e-mailing function because it "cannot discriminate between sharing with a boss and sharing with a

friend" ([Aug.2015.Op.14]) and the possibility of "indiscriminate sharing … risks [it] becoming a substitute" for Fox's website ([Aug.2015.Op.15]).  The court thus ruled that TVEyes' e-mailing function may be a fair use only if TVEyes "develop[s] protocols to reasonably assure that, when subscribers share video clips, they do so consistent with § 107."  [Aug.2015.Op.15].

*Downloading*:  The district court ruled that TVEyes' downloading function is not a fair use because it "goes well beyond TVEyes' transformative services," citing cases where the downloading of protected content was found to constitute infringement.  [Aug.2015.Op.16].  The court opined that "few remaining locations in the United States lack internet connectivity," and that while the function is "convenient, [it] is not integral to TVEyes' transformative purpose." [Aug.2015.Op.16-17].  The court made no reference to any market harm from the downloading function other than an unexplained assertion that it "poses undue danger" to copyright holders ([Aug.2015.Op.16]), nor did it acknowledge TVEyes' contractual restrictions on subscribers' distribution of downloaded clips.

*Date/Time Searching*: The district court found the date/time-search function not to be a fair use, based on the assumption that subscribers "already know what they seek" so subscribers "should be able to procure the desired clip from [Fox] or its licensing agents."  [Aug.2015.Op.18].  Further, the court held that this function "is likely to cannibalize" Fox's website traffic and licensing activity ([Aug.2015.Op.18]),

21

omitting to mention that Fox makes only 16% of its broadcast content available on its website and does not offer licenses for research purposes.

The court instructed the parties to submit proposed "protective measures" for TVEyes' e-mailing function, "suggest an appropriate decree," and advise "whether any issue of damages remain." [Aug.2015.Op.18-19].

### 3. The November 6, 2015 Order

In a brief order dated November 6, 2015, the district court rejected TVEyes' argument that consideration of injunctive or monetary relief was premature because, even if the e-mailing, downloading and date/time-search functions are not fair uses, Fox had not yet met its burden of proving that TVEyes was liable for direct copyright infringement under *Cablevision*. The court held that, "where TVEyes functions went beyond the scope of fair use," direct infringement necessarily existed, and that *Cablevision* is distinguishable because the defendant there did not store the allegedly infringing works for more than a transitory period. [Nov.2015.Op.2]. The court issued the permanent injunction on the same date ([Injunction]), without addressing any of the four *eBay* factors necessary for supporting injunctive relief or making any factual findings supporting the issuance of a permanent injunction.

### SUMMARY OF ARGUMENT

**I.** TVEyes' service, which creates a comprehensive electronic database of television content and provides six integrated functions that allow subscribers to

search for, view, archive, e-mail, download and perform date/time searches on television clips for purposes of internal research and analysis, is a protected fair use under Section 107 in its entirety. The district court erred in excluding the e-mailing, downloading, and date/time-search functions from fair use protection.

*First*, the court applied the wrong legal test, asking whether the ability to e-mail, download or search by date/time is "integral" to TVEyes rather than applying Section 107's four factors.

*Second*, the court erred under that traditional four-factor test in finding that e-mailing, downloading and date/time searching are not fair uses. E-mailing, downloading, and date/time searching are used for the same transformative purposes and provide the same public benefit as the searching, viewing and archiving functions, and there is no more harm to Fox's actual or potential market from the former three functions than from the latter three.

**II.** The district court independently erred by holding TVEyes liable for direct copyright infringement. Because the e-mailing, downloading and date/time-search functions merely provide subscribers with access to a system that automatically produces copies at a subscriber's command, Fox cannot establish the volitional conduct by TVEyes that is a key element of direct liability under this Court's *Cablevision* decision.

**III.**   The district court also independently abused its discretion by issuing injunctive relief without applying the four *eBay* factors, none of which supports injunctive relief.  The injunction should also be vacated as overbroad because it extends to *all* future Fox programs and is not tailored to the specific Works.

## STANDARD OF REVIEW

This Court reviews a grant of summary judgment *de novo*, construing the record in the light most favorable to the non-moving party.  *Ali v. Fed. Ins. Co.*, 719 F.3d 83, 90 (2d Cir. 2013).  This Court reviews a district court's grant of a permanent injunction for abuse of discretion.  *ACORN v. United States*, 618 F.3d 125, 133 (2d Cir. 2010).  A district court abuses its discretion "when (1) its decision rests on an error of law (such as application of the wrong legal principle) or a clearly erroneous factual finding, or (2) its decision—though not necessarily the product of a legal error or a clearly erroneous factual finding—cannot be located within the range of permissible decisions."  *Id*. (internal quotation marks omitted).  This Court reviews questions of law de novo.  *Id.*

## ARGUMENT

## I.   TVEYES' E-MAILING, DOWNLOADING AND DATE/TIME-SEARCH FUNCTIONS ARE PROTECTED FAIR USES

This Court has long made clear that even verbatim use of a work is a fair use under the Copyright Act, 17 U.S.C. § 107, if it is transformative and unlikely to harm the market for the original.  *See Authors Guild v. Google, Inc.* ("*Google*"), 804 F.3d

202 (2d Cir. 2015); *Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.* ("*Swatch*"), 756 F.3d 73 (2d Cir. 2014); *HathiTrust*, 755 F.3d 87.  As with other electronic research services this Court has considered in prior recent copyright cases, *see*, *e.g.*, *Google*, 804 F.3d at 214-25 (verbatim digitizing of books and allowing users to view snippets of text); *Swatch*, 756 F.3d at 81-92 (verbatim copying and distribution of copyrighted earnings calls); *HathiTrust*, 755 F.3d at 94-101 (verbatim copying of books to create searchable database), TVEyes' service constitutes a classic fair use.

The district court erred in disregarding these precedents and inventing its own new test, asking whether the e-mailing, downloading and date/time-search functions are "*integral* to" TVEyes' otherwise transformative (and thus protected) services. [Aug.2015.Op.2] (emphasis added).  That test has no basis in the Copyright Act or this Court's precedent.   Any use that satisfies the four-factor test set forth in Section 107—for example, by serving a different purpose than the original work and having no market effect on that work—constitutes a fair use, whether or not it is "integral" to a copyright defendant's otherwise protected activities.  In *Google*, for example, this Court undertook a methodical Section 107 analysis not only of Google's search function, but also of its snippet function, concluding that the latter was a fair use without separately analyzing how "integral" the snippet function was to the search function.  804 F.3d at 216-25.

When properly analyzed under Section 107's four-factor test, as detailed below, each aspect of TVEyes' service—including its e-mailing, downloading and time/date-search functions—easily constitutes a fair use. Enabling subscribers to e-mail links to clips, download clips and search for clips by date/time—all for the purposes of research, analysis and commentary on televised content—are prototypical fair uses. The judgment below should be reversed and the injunction vacated. This Court should also instruct that summary judgment be entered for TVEyes. *See*, *e.g.*, *Cariou v. Prince*, 714 F.3d 694, 712 (2d Cir. 2013) (reversing district court's ruling that 25 artworks were not fair uses and directing entry of summary judgment in defendant's favor).

## A. The E-mailing, Downloading And Date/Time-Search Functions Are Transformative Uses

The first fair use factor considers "the purpose and character of the use." 17 U.S.C. § 107(1). "[T]here is a strong presumption that factor one favors the defendant if the allegedly infringing work fits the description of uses described in [the preamble] of §107" such as research, criticism, comment, and news reporting. *NXIVM Corp. v. Ross Inst.*, 364 F.3d 471, 477 (2d Cir. 2004) (internal quotation marks omitted); *see* 17 U.S.C § 107 (preamble) (referring to "criticism, comment, news reporting, teaching[,] … scholarship, [and] research"). "An important focus of the first factor is whether the use is 'transformative.'" *HathiTrust*, 755 F.3d at 96.

26

Under this Court's precedent, a use is transformative if it "communicates something new and different from the original or expands its utility." *Google*, 804 F.3d at 214. "The more the appropriator is using the copied material for new, transformative purposes, the more it serves copyright's goal of enriching public knowledge and the less likely it is that the appropriation will serve as a substitute for the original or its plausible derivatives …." *Google*, 804 F.3d at 214. A secondary work can be transformative even "'without altering or adding to the original work.'" *Swatch*, 756 F.3d at 84 (quoting *A.V. ex rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630, 639 (4th Cir. 2009)). For example, Google's verbatim copying of millions of copyrighted books without alteration for the purpose of creating a text-searchable database, and displaying snippets of text in response to user queries, was "highly transformative," even though Google did not modify the text; a different purpose alone was sufficient. *Google*, 804 F.3d at 216-18; *see also HathiTrust*, 755 F.3d at 97 (finding text-searchable database "a quintessentially transformative use"); *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 609 (2d Cir. 2006) (finding Grateful Dead posters reproduced in their entirety transformative because they were repurposed as "historical artifacts to document and represent the actual occurrence of Grateful Dead concert events"); *White v. West Publ'g Corp.*, No. 12-cv-1340, 2014 WL 3385480, at *2 (S.D.N.Y. July 11, 2014) (finding distribution of copyrighted briefs on Westlaw transformative because used not for the purpose of

27

providing legal services but rather "toward the end of creating an interactive legal research tool").[6]

All of TVEyes' functions are transformative under these precedents, for each of them enables subscribers to fulfill purposes that differ from the original news and entertainment purposes of the broadcasts. *See Google*, 804 F.3d at 220 (assessing as part of transformation whether "the copying work has an objective that differs from the original"). For example, elected officials monitor broadcasts for inaccurate information to make timely corrections ([Sept.2014.Op.25-26; 1st.Ives.Decl. ¶10; 1st.Anten.Decl.Ex.DDD; Fox.Resp.56.1 ¶54]); law enforcement entities track the dissemination of public service announcements ([Sept.2014.Op.2-3; 1st.Ives.Decl.¶10; 1st.Seltzer.Decl. ¶37, Ex.J])[7]; journalists research, comment on and criticize television news ([Sept.2014.Op.26; 1st.Rose.Decl. ¶¶15-25, Exs.KK-UU; 1st.Ives.Decl. ¶10; Fox.Resp.56.1 ¶53]), and Fox in particular ([1st.Rose.Decl. ¶27, Ex.WW]); and political campaigns prepare candidates for television appearances and press interviews

---

[6]  Other circuits are in accord. *See*, *e.g.*, *Vanderhye*, 562 F.3d at 639 (finding protected as transformative copying entire essays without alteration into database for purpose of plagiarism detection ); *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1165 (9th Cir. 2007) (finding protected as transformative the copying of entire images into database for purpose of Internet search engine results); *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 819 (9th Cir. 2002) (similar).

[7]  Four of the five most-monitored Watch Terms on TVEyes involve law enforcement. [1st.Seltzer.Decl. ¶37, Ex.J] ████████████████████████████████ ███████████████████████ .

([Sept.2014.Op.25-26; 1st.Ives.Decl. ¶10; 4th.Ives.Decl. ¶6, Ex.ZZZZ; Fox.Resp.56.1 ¶51]). And the TVEyes functions the district court improperly enjoined are no less transformative than the functions the district court correctly upheld as fair uses. When subscribers access clips via e-mailing and downloading or search by date/time, they are accessing the same clips, in aid of the same transformative and beneficial research, criticism and comment, as when they access those clips by streaming and keyword searches.

## 1.    E-mailing Function

TVEyes allows its subscribers to send e-mails containing links to clips. [4th.Seltzer.Decl. ¶8]. As an initial matter, TVEyes' e-mailing function cannot constitute infringement because it merely enables the sharing of a *link* to a clip via e-mail and therefore does not implicate any of Fox's exclusive rights (*e.g.,* reproduction, distribution or performance) under 17 U.S.C. § 106. This alone warrants a finding of non-infringement.

In any event, this function is transformative. It enables subscribers to collaborate with others such as colleagues and co-workers for the same transformative "research, criticism, and comment" purposes ([Sept.2014.Op.20]) for which they originally obtained the clips. *See* [4th.Ives.Decl. ¶¶9-13; Karle.Rep. ¶¶6-7, 47-51].

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████.

29

[1st.Anten.Decl.Ex.GGG.at.FOXNEWS0001405, 1407, 3763, 3809, 3812; 1st.Ives.Decl. ¶10].

The district court recognized that, without the e-mailing function, the utility of TVEyes' service would be greatly diminished:

> I agree that to prohibit e-mail sharing would prevent TVEyes users from realizing much of the benefit of its transformative service. … There are many players in the marketplace of ideas, each with supporting staffs of employees, interns, and independent consultants. And once information is located, parties must be able to transmit that information as part of comment, criticism, and debate. E-mailing of URL links allows information to reach the individuals who need to know what is being said in order to engage in news reporting, commentary, criticism, teaching, scholarship, research, and other fair uses permitted by the Copyright Act.

[Aug.2015.Op.14]. As the court found, e-mail is an essential component of TVEyes' service. [Aug.2015.Op.14; Karle.Rep. ¶¶47-51].

The district court nonetheless held that TVEyes' e-mailing function was not a fair use because it "cannot discriminate between sharing with a boss and sharing with a friend, nor between sharing for inclusion in a study and sharing a clip for inclusion in a client sales pitch," and thus there is "*potential* for abuse." [Aug.2015.Op.14] (emphasis added). That was error.

*First*, the court ignored that TVEyes' subscribers are contractually bound to limit their use of TVEyes' service (which includes its e-mailing function) to internal research and analysis only. *See* [1st.Ives.Decl. ¶¶7-8, Exs.A-B]; *See also supra* 8-9.

30

*Second*, there is no evidence that any Fox clips—whether from the Works or otherwise—were e-mailed to any third party in a manner inconsistent with this contractual restriction or with principles of fair use. The court's concern that the e-mailing function would *potentially* be "misused" in the future was pure speculation, an argument this Court rejected in *Google*:

> We recognize the possibility that libraries may use the digital copies Google created for them in an infringing manner. If they do, such libraries may be liable to Plaintiffs for their infringement. It is also possible that, in such a suit, Plaintiffs might adduce evidence that Google was aware of or encouraged such infringing practices, in which case Google could be liable as a contributory infringer. But on the present record, the possibility that libraries may misuse their digital copies is sheer speculation.

804 F.3d at 229. So too here, a speculative "potential for abuse" by third parties is no ground for denying TVEyes' fair use defense to a claim of direct infringement.[8]

Other courts have properly found fair use in similar circumstances involving e-mailing, as the district court should have found here. *See*, *e.g.*, *White*, 2014 WL 3385480, at *2 (transformation where Westlaw allows users to e-mail and download as-filed PDF copies of original briefs for purpose of conducting research); *Am. Inst. of Physics v. Winstead PC*, No. 12-cv-1230, 2013 WL 6242843, at *1-2, 5-6 (N.D. Tex.

---

[8]  The district court similarly disregarded TVEyes' restrictions and the absence of non-speculative evidence with regard to TVEyes' downloading and date/time-search functions. *See infra* Parts 1.A.2-3.

Dec. 3, 2013) (where original reproduction of articles was fair use, holding later circulation of the same articles in internal firm and client e-mails also fair use because the latter were "functionally identical" to the original reproduction).

## 2.      Downloading Function

TVEyes allows subscribers to download clips onto the hard drive of a computer or other device (such as a smart phone or tablet) so that they can retain a permanent record of their research,  view clips offline when an Internet connection is unreliable or unavailable and organize and store clips together with research materials from sources other than TVEyes.   [4th.Ives.Decl. ¶¶14-20; Karle.Rep. ¶¶52-59, 86]. Subscribers download clips obtained from TVEyes for the same reasons they search for and view them:   to engage in "research, criticism, and comment." [Sept.2014.Op.20].   Such purposes are altogether different from Fox's news and entertainment purposes in creating the Works.   Downloading clips supports TVEyes subscribers' research and analysis, and is thus transformative.

The district court erred in holding otherwise, relying on inapposite cases.  Each of the cases on which the court relied ([Aug.2015.Op.16]) involved defendants that engaged in downloads that were a mere substitute for the copyrighted works, and thus (unlike here) involved no transformative use. *See New York Times Co. v. Tasini*, 533 U.S. 483, 498 (2001) (newspaper articles downloaded for original purpose; fair use not asserted); *Capitol Records, LLC v. ReDigi, Inc.*, 934 F. Supp. 2d 640, 653

(S.D.N.Y. 2013) (music file downloads not transformative because used for original purpose); *A&M Records, Inc. v. Napster, Inc.*, 114 F. Supp. 2d. 896, 913 (N.D. Cal. 2000) (same); *UMG Recordings, Inc. v. MP3.com, Inc.*, 92 F. Supp. 2d 349, 351 (S.D.N.Y. 2000) (same). By contrast, TVEyes' subscribers download clips for *different* purposes that "expand[]" the "utility" of the content and "contribut[e] to public knowledge." *Google*, 804 F.3d at 214.

Likewise, the district court erred in holding that TVEyes' downloading function is merely "convenient" ([Aug.2015.Op.17]) and thus "not sufficiently related to the functions that make TVEyes valuable to the public" ([Aug.2015.Op.16]). Again, downloading furthers TVEyes' transformative purpose by facilitating viewable access to clips for research, comment and criticism, and the cases cited by the district court ([Aug.2015.Op.17]) are inapposite. Each of those cases involved defendants who used the copyrighted content for its original purpose, not a transformative purpose, or who made copies for personal convenience. *See Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 922-23 (2d Cir. 1994) (copying of journal articles for their intrinsic purpose as reference materials for convenience of scientists was neither transformative nor otherwise fair); *United States v. ASCAP*, 599 F. Supp. 2d 415, 424-29 (S.D.N.Y. 2009) (use of ringtone previews as advertisement for sale of ringtones not transformative). TVEyes' downloading function is not offered for the mere

"convenience" of watching Fox programming for its original purpose; rather, it is an integrated part of TVEyes' overall service, which is transformative and thus protected.

### 3. Date/Time-Search Function

TVEyes' date/time-search function provides an alternate search method by enabling users to find and view clips broadcast at a particular time (within the past 32 days) on a particular station. [1st.Seltzer.Decl. ¶26; 4th.Ives.Decl. ¶¶21-26; Karle.Rep.¶¶60-67]. Searching by date/time rather than keyword is necessary when a subscriber's research does not pertain to whether a particular keyword was mentioned in a broadcast, such as to:

- Compare and contrast the lead stories reported at a particular time across various news networks. [Karle.Rep.¶66].

- Determine quickly which news outlet "broke" a story first. [4th.Ives.Decl.¶25; Karle.Rep.¶63, Ex.5] (examples of journalists using TVEyes to determine who broke story first); [Dkt.73("2d.Anten.Decl.")Ex.WWW].

- Locate a graphic, an expression, a reaction or a picture on a particular broadcast. [4th.Ives.Decl. ¶24, Ex.BBBBB; Karle.Rep. ¶¶64, 85(d), Ex.6] (examples of journalists criticizing use of images on FNC).

- Study advertisements associated with particular news broadcasts and shows. [1st.Ives.Decl. ¶10; 1st.Seltzer.Decl. ¶47(e)].

- Learn the market viewership or publicity values associated with a particular broadcast. [4th.Ives.Decl. ¶26 & Ex.CCCCC] (periodical using date/time-search to assess publicity values of clips); *see also*, *e.g.*, [3d.Rose.Decl. ¶10 & Ex.NNNNN.at.1-3] (using TVEyes to estimate value of national publicity FNC gave to an anti-Hillary Clinton book); [3d.Rose.Decl.Ex.NNNNNat.4-5] (using TVEyes to estimate value of national publicity FNC gave to a Republican National Committee attack ad).

- Assemble clips of statements by political candidates in televised interviews for comparison to future statements. [Karle.Rep. ¶¶83-84].

Each of these uses is transformative because it leverages the broadcast not for Fox's protected copyrighted expression or original purpose, but for a new and different purpose that benefits society by furthering "the harvest of knowledge." *Harper & Row Pubs., Inc. v. Nation Enters.*, 471 U.S. 539, 545 (1985); *see Google*, 804 F.3d at 214 ("[t]he more the appropriator is using the copied material for new, transformative purposes, the more it serves copyright's goal of enriching public knowledge").

In addition, date/time searching is used as a back-up to locate content when keyword searches fail because of spelling or other errors in the closed-captioning text associated with the broadcasts. *See* [4th.Ives.Decl. ¶22] (giving examples of closed-captioning errors or omissions requiring that subscribers search by date/time to locate the desired content); [Karle.Rep, ¶¶61-62]. Subscribers who assemble comprehensive datasets on a particular issue or keyword use this function to fill in the gaps missed by keyword search. [4th.Ives.Decl. ¶23; Karle.Rep. ¶61]. Thus, the ability to search by date/time makes TVEyes a more robust search engine, furthering "criticism, comment, news reporting, teaching[,] ... scholarship, [and] research." 17 U.S.C § 107.

The district court erred in holding that the date/time-search function is not transformative merely because subscribers who use it may already be aware that the content they seek has aired. [Aug.2015.Op.18]. A subscriber's prior knowledge that a clip may exist is unrelated to whether the subsequent use of the clip is *fair*. For

example, using the date/time-search function to compare and contrast the lead stories run by various news networks on a particular date at a particular time is no less fair than comparing how those news networks have used a particular keyword over time. Moreover, as the district court explained, it is often not sufficient merely to know that something was said on television; the images must be *seen* and the audio *heard* to access the full spectrum of information conveyed. [Sept.2014.Order.18] ("The actual images and sounds depicted on television are as important as the news information itself—the tone of voice, arch of an eyebrow, or upturn of a lip can color the entire story, powerfully modifying the content.").

\*   \*   \*

For all these reasons, the e-mailing, downloading and date/time-search functions are transformative. They facilitate the access to clips used for research purposes different from the news and entertainment purposes that led to the creation of the Works. As the district court stated succinctly: "Monitoring television is simply not the same as watching it." [Sept.2014.Op.27].

Because TVEyes' entire service—including not only its searching, viewing, and archiving functions but also its e-mailing, downloading and date/time-search functions—are highly transformative, the first fair use factor is established. Were there any doubt (there is not), the first factor is also satisfied—even absent transformation—because TVEyes' secondary use of clips from Fox programs benefits

36

society.  *See Campbell*, 510 U.S. at 579 ("[T]ransformative use is not absolutely necessary for a finding of fair use.").  The record in this case provides at least as much evidence of beneficial use as in other cases finding certain uses fair even if not transformative.[9]

**B.     The Works Are Factual In Nature And Were Previously Published**

The second fair-use factor assesses "the nature of the copyrighted work." 17 U.S.C. § 107(2).  "It is well-established that 'the scope of fair use is greater with respect to factual than non-factual works.'"  *Swatch*, 756 F.3d at 89 (quoting *New Era Publ'ns Int'l, ApS v. Carol Publ'g Grp.*, 904 F.2d 152, 157 (2d Cir. 1990)).  That is because "facts and ideas" are excluded from copyright protection, *Campbell*, 510 U.S.

---

[9]     In *Google,* for example, Google's distribution to its library partners of entire digital copies of plaintiffs' copyrighted books "to permit the library to use its digital copy in a non-infringing fair use manner," although not transformative, was held to be fair. 804 F.3d at 228.  Likewise in *HathiTrust,* the creation of digital copies of entire books for the visually-impaired was held not transformative because "the underlying purpose of [defendant's] use is the same as the author's original purpose," but was nonetheless held to be fair because "providing access to the print-disabled" was "a valid purpose" under the Copyright Act.  755 F.3d at 101-02.  And in *Swatch*, disseminating "a full, unadulterated recording" of an earnings call was held to be fair "regardless of how transformative the use is" because "Bloomberg's faithful reproduction … served 'the interest of accuracy, not piracy.'"  756 F.3d at 85 (quoting *Consumers Union of United States, Inc. v. Gen. Signal Corp.*, 724 F.2d 1044, 1049 (2d Cir. 1983)); *see also Sony Corp. of Am. v. Universal City Studios, Inc.* ("*Sony*"), 464 U.S. 417, 455 n.40 (1984) (acknowledging possible benefits from copying that might otherwise seem to serve "no productive purpose"); *Consumers Union*, 724 F. 2d at 1049 (secondary use of copyrighted content in commercial advertising was fair because it conveyed "to consumers … useful information which is protected by the First Amendment.").

at 575 n.5, and thus "facts contained in existing works may be freely copied," *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 359 (1991). Indeed, "in the case of factual [works], there is often occasion to test the accuracy of, to rely on, or to repeat their factual propositions" and therefore "factual works often present well justified fair uses, even if the mere fact that the work is factual does not necessarily justify copying of its protected expression." *Google*, 804 F.3d at 220 n.21; *see also Harper & Row*, 471 U.S. at 563 ("expressive language may be copied … to assure dissemination of the underlying facts"). In addition, this Court considers "whether the work is published or unpublished, with the scope of fair use involving unpublished works being considerably narrower." *Cariou*, 714 F.3d at 709-10.

These principles apply to the factual elements of television news broadcasts. *Harper & Row*, 471 U.S. at 556-57 ("The news element—the information respecting current events contained in the literary production—is not the creation of the writer, but is a report of matters that ordinarily are *publici juris*; it is the history of the day.") (quoting *INS v. AP*, 248 U.S. 215, 234 (1918)); *see also Feist*, 499 U.S. at 348. As this Court has recognized, "[i]n the context of news reporting and analogous activities … the need to convey information to the public accurately may in some instances make it desirable and consonant with copyright law for a defendant to faithfully reproduce an original work without alteration." *Swatch*, 756 F.3d at 84.

The above considerations apply equally to TVEyes' e-mailing, downloading and date/time-search functions. For each, it is undisputed that the Works pertain to factual news of the day and were already published when they were accessed by TVEyes' subscribers. [Sept.2014.Op.20-21; 1st.Anten.Decl.Exs.BBB-1-19]. As the product of a popular news network, the Works were viewed by millions before TVEyes made them accessible to its small subscriber base.

Moreover, certain elements of the Works—such as the facts conveyed during the broadcasts, information about the broadcasts themselves, and third-party content they contain[10]—are not protected by Fox's copyrights. [Sept.2014.Op.20-21]. TVEyes subscribers routinely access these unprotected aspects for their research. For example, elected officials monitor the accuracy of facts reported to make timely corrections ([Sept.2014.Op.25-26; 1st.Ives.Decl. ¶10; 1st.Anten.Decl.Ex.DDD; Fox.Resp.56.1 ¶¶54, 57]); television producers, ███████████, research the programming of their competitors ([1st.Anten.Decl.Ex.GGG; 1st.Ives.Decl. ¶10]); police departments track coverage of public safety messages ([Sept.2014.Op.2-3; 1st.Ives.Decl.¶10; 1st.Seltzer.Decl. ¶37, Ex.J]); journalists determine which network "broke" a story first ([4th.Ives.Decl. ¶25; Karle.Rep. ¶63 & Ex.5]); and the U.S. Army

---

[10] For example, the Works contain clips from broadcasts of competing news channels, such as CNN and MSNBC. [1st.Rose.Decl.Ex. II] (listing third-party excerpts contained in the Works).

analyzes news coverage of military operations to ensure the national security and troop safety ([Sept.2014.Op.26; 1st.Ives.Decl. ¶10; Fox.Resp.56.1 ¶49]). TVEyes subscribers must access Fox's expressive content to also access the unprotected information contained therein. *Cf. Google*, 804 F.3d at 224 (access to copyrighted snippets of text was fair particularly where content was accessed for its unprotectable elements). The highly factual nature and previously published status of the Works favor a finding of fair use under the second factor.

### C. The Works Are Used Only In A Limited And Targeted Way

The third fair-use factor considers "the amount and substantiality of the portion used in relation to the copyrighted work as a whole." 17 U.S.C. § 107(3). Under this factor, this Court asks "whether the secondary use employs more of the copyrighted work than is necessary, and whether the copying was excessive in relation to any valid purposes asserted under the first factor." *HathiTrust*, 755 F.3d at 96; *cf. Harper & Row*, 471 U.S. at 563 ("The extent to which one must permit expressive language to be copied, in order to assure dissemination of the underlying facts, will thus vary from case to case.").

With respect to this factor, the e-mailing, downloading and date/time-search functions may be considered together because all are used to access clips narrowly tailored to meet subscribers' research objectives. Over 85% of clips sourced from the Works were viewed for less than one minute, and more than half were viewed for less

than 10 seconds. [1st.Seltzer.Decl. ¶45]. In other words, the "amount" of the Works accessed by users for their research purposes was not excessive. Moreover, there is no evidence that these clips targeted "the most appealing segment of the author's expressive content," *i.e.*, the heart of the work. *Google*, 804 F.3d at 227.

### D. The E-mailing, Downloading And Date/Time-Search Functions Do Not Harm The Market For The Works

The fourth factor considers "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). This factor asks whether the secondary use is a "significantly competing substitute" for the original work or its derivatives. *Google*, 804 F.3d at 222; *see also HathiTrust*, 755 F.3d at 96 ("To defeat a claim of fair use, the copyright holder must point to market harm that results because the secondary use serves as a substitute for the original work."). Legally cognizable market harm is limited to the loss of "traditional, reasonable, or likely to be developed markets" for licensing the Works. *Bill Graham*, 448 F.3d at 614 (internal quotation marks omitted).

It is well established in this Circuit that "any economic 'harm' caused by transformative uses does not count because such uses, by definition, do not serve as substitutes for the original work." *HathiTrust*, 755 F.3d at 99; *Bill Graham*, 448 F.3d at 615 ("[c]opyright owners may not preempt exploitation of transformative markets") (quoting *Castle Rock*, 150 F.3d at 146 n.11); *see also Google*, 804 F.3d at 223 ("[T]he more the copying is done to achieve a purpose that differs from the purpose of the

original, the less likely it is that the copy will serve as a satisfactory substitute for the original.").

Even where there is some evidence of harm to the copyright holder, that harm must be "substantial," "significant," and "excessive" to weigh against fair use.  *See Campbell*, 510 U.S. at 593 ("Evidence of *substantial* harm to [the market] would weigh against a finding of fair use.") (emphasis added); *Google*, 804 F.3d at 224 ("There must be a *meaningful or significant* effect 'upon the potential market for or value of the copyrighted work.'") (emphasis added); *HathiTrust*, 755 F.3d at 95 ("[a] fair use must not *excessively* damage the market for the original") (emphasis added). Indeed, "the possibility, or even the probability or certainty, of some loss of sales does not suffice to make the copy an effectively competing substitute that would tilt the weighty fourth factor in favor of the rights holder in the original."  *Google*, 804 F.3d at 224.

Finally, this factor "requires a balancing of [1] the benefit the public will derive if the use is permitted and [2] the personal gain the copyright owner will receive if the use is denied."  *Bill Graham*, 448 F.3d at 613 (internal quotation marks omitted); *see also Swatch*, 756 F.3d at 92 (defendant's use "served the important public purpose of disseminating important financial information."); *Perfect 10*, 508 F.3d at 1166 (considering "the extent to which [defendant's] search engine promotes the purposes of copyright and serves the interests of the public").

Under these standards, none of TVEyes' e-mailing, downloading and date/time-search functions has a cognizable effect on Fox' actual or derivative markets for the Works.

### 1. E-mailing Function

There is no evidence in the record that subscribers' ability to e-mail links to TVEyes clips for research purposes has any meaningful effect on Fox's third-party licensing business. That is unsurprising, because Fox and TVEyes serve entirely different markets that do not overlap. Through its exclusive arrangement with ITN Source, Fox licenses broadcast footage to third parties for use in television shows, movies, advertisements, museum displays and similar projects that require a public performance license. [1st.Anten.Decl.Ex.JJJ; 1st.Rose.Decl.¶¶ 2-4] Those clients are charged ▮▮▮▮▮▮▮▮▮▮▮▮ per clip for public performance licenses. [1st.Rose.Decl. ¶¶2-3, Ex.M]. TVEyes, on the other hand, explicitly prohibits such uses and restricts subscribers' use of clips (including sending links via e-mail) to internal research only. *See supra* 8-9; [2d.Ives.Decl. ¶¶10-12].

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. [1st.Rose.Decl. ¶¶2-3; Karle.Rep. ¶¶[113-18; Dkt.141("2d.Karle.Decl.") ¶¶12-20]. ▮▮▮▮▮▮▮▮▮▮▮▮▮

███████████████████████████████████████████████████████████.

[1st.Rose.Decl. ¶¶2-3; Karle.Rep. ¶¶124-25].

███████████████████████████████████████████

███████████████████████████████ ██████████████████████.

*First*, Fox licensees must agree not to use footage to criticize Fox:



[1st.Anten.Decl.Ex.KKK.at.ITNSOURCE0000161 §7]; *see also*

[3d.Rose.Decl.Ex.KKKKK.at.ITNSOURCE0000011 §5.1.1]. ███████████

██████████████████████████████████████████████████████████

███████████████████████████████████████████:

[3d.Rose.Decl.Ex.KKKKK.at.ITNSOURCE0000011 §2.4] (emphasis added). *Third*,

████████████ ███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████.

[3d.Rose.Decl.Ex.KKKKK.at.ITNSOURCE0000011 §5.1.2; 3d.Rose.Decl.Ex.FFFFF; 1st.Anten.Decl.Ex.LLL (124:15-125:12)]. And *fourth*, ████████████████████

█████████████ █████████████████████████████

███████████████████████████████████████████.

[1st.Anten.Ex.III.at.FOXNEWS0000420, 424 §4.5; 1st.Anten.Ex.LLL (122:14-124:5)].

Because Fox licensees are contractually prohibited from criticizing Fox, ████████

███████████████████████████████████████████

████████████████████████████████. As this Court has recognized, "copyright owners may not preempt exploitation of transformative markets," *Bill Graham*, 448 F.3d at 615, especially where the transformation serves to critique and comment upon the copyright owner, *see Campbell*, 510 U.S. at 592 ("[T]he unlikelihood that [copyright holders] will license critical reviews or lampoons of their own productions removes such uses from the very notion of a potential licensing market.").

Nor do subscribers' e-mails for internal research purposes deprive Fox of traffic to its website. Consumers visit Fox's website, which provides personal entertainment and news to mass consumer audiences, so that they may read the top news stories of

the day, view trending videos and peruse the site at their leisure. [2d.Karle.Decl. ¶¶4, 27; Villar.Decl. ¶23, Ex.8]. Only about 16% of Fox's broadcasts are ever available for viewing on its website, all in the form of pre-edited video segments selected by Fox's editorial staff for their newsworthiness. [Sept.2014.Op.7; 1st.Misenti.Decl. ¶¶12-13].[11] TVEyes, by contrast, caters to an entirely different market: It is a database and research tool for business and government subscribers who need access to comprehensive, as-aired television broadcast clips. [1st.Ives.Decl. ¶6; Karle.Rep. ¶92; 2d.Karle.Decl. ¶5]. The e-mailing function merely allows subscribers to share links to clips in furtherance of those research objectives.

The record shows that TVEyes subscribers who share and receive links to clips via the e-mailing function are unlikely to use Fox's website as an alternative for such research, for at least the following reasons:

- Fox's website expressly prohibits visitors from using content on the site for business purposes. [1st.Rose.Decl.Ex.HH.at1-2 (Terms of Service); Fox.Resp.56.1 ¶114; Karle.Rep. ¶92].

- Only 16% of Fox broadcasts are available on its website, rendering the vast majority of Fox broadcasts unavailable online. [Sept.2014.Op.7; Karle.Rep. ¶89].

---

[11] The websites of Fox's syndicated partners such as Hulu and Yahoo! ███████ ████████████████████████████████. [4th.Rose.Decl.Ex.KKKKKK (229:24-230:25); 1st.Misenti.Decl. ¶13]. In other words, about 84% of Fox broadcasts are not made available by Fox *anywhere* on the Internet.

46

- Video segments on Fox's website are edited versions of the original broadcasts that do not contain the "ticker" information that appears on the bottom of the screen during broadcasts and are sometimes "corrected" by Fox. [Sept.2014.Op.7; 3d.Rose.Decl.Ex.MMMMM (113:4-114:21, 124:14-127:7); Fox.Resp.56.1 ¶¶[111-13].

- Video segments posted to Fox's website are hand-selected by Fox's editors for their newsworthiness and to further Fox's editorial agenda. [1st.Misenti.Decl. ¶12; 3d.Rose.Decl.Ex.MMMMM (120:14-121:16)].

- Video segments posted to Fox's website lack basic information that is often necessary for secondary research, such as the time that the footage was originally broadcast. [1st.Seltzer.Decl. ¶47(f)].

- Video segments from Fox's website cannot be saved, edited or downloaded by visitors to the site. [3d.Rose.Decl.Ex.KKKKKK (94:5-7); 3d.Rose.Decl.Ex.KKKKKK (92:10-12); 1st.Rose.Decl.Ex.HH.at.2].

- Video segments returned by keyword searches on Fox's website always start at the beginning of the predetermined "story," rather than directing the visitor to the few seconds before the keyword appears that may be needed for context. [1st.Seltzer.Decl. ¶¶18, 28, 47(c), 48; 1st.Ives.Decl. ¶15].

Because Fox's and TVEyes' markets are thus distinct, the district court erred in its unsupported speculation ([Aug.2015.Op.15]) that there is a "risk[]" that e-mailed links to TVEyes clips could serve as substitutes for the video segments on Fox's website. *Cf. Sony*, 464 U.S. at 453-54 (copyright owners' "prediction that live television or movie audiences will decrease" was "speculative"). In fact, there is no evidence in the record that Fox ever lost any visitors to its website because of subscribers' ability to e-mail links to TVEyes clips. The hypothetical possibility that a subscriber in the future *might* breach its contract with TVEyes by sharing a link to a Fox clip "for purposes not protected by § 107" ([Aug.2015.Op.15]) does not render

this valuable function *per se* unfair—rather, in that unlikely event, Fox has a remedy against the subscriber. *See Google*, 804 F.3d at 229 ("We recognize the possibility that libraries may use the digital copies Google created for them in an infringing manner. If they do, such libraries may be liable to Plaintiffs for their infringement.").

Further, no meaningful harm to Fox could ever stem from TVEyes' e-mailing function because another service openly embraced by Fox—the TV News Archive— not only captures all FNC and FBN broadcasts, but allows the public to watch unlimited numbers of FNC and FBN clips and e-mail those clips for *any* purpose. *See* [2d.Karle.Decl. ¶¶51-52].[12] Thus, Fox cannot establish that anyone who sent an e-mail using TVEyes would have otherwise visited Fox's website or sought a license.

But even if Fox had shown that *some* subscribers who accessed the Works via the e-mailing function would have otherwise obtained a license or visited Fox's website to search for and e-mail links to those same clips (it has not), there is no showing in the record that any effect on Fox's revenues would have been "meaningful or significant." *Google*, 804 F.3d at 224. [Karle.Rep. ¶¶93-102].[13] Fox suffers no

---

[12] The TV News Archive also allows users to publicly post unlimited Fox clips to social media and to review clips based on date and time of airing. [2d.Karle.Decl. ¶¶51-52]. Thus, for the same reasons, TVEyes' downloading and date/time-search functions are unlikely to cause any significant harm to Fox.

[13] In the entire 32 days that the Works were available on TVEyes, only 61 subscribers viewed clips from the Works, only 15 subscribers downloaded clips from the Works, and only six subscriber e-mails were sent containing links to clips from the Works.
(*footnote continued*)

market harm from TVEyes' e-mailing function because it is not a substantially competing substitute for any of Fox's derivative offerings.

## 2. Downloading Function

For similar reasons, TVEyes' downloading function does not cause market harm to Fox. TVEyes expressly prohibits users from downloading clips for purposes other than internal research, and therefore this function does not compete with Fox's public performance licensing business. *See supra* 8-9. Further, there is no evidence that any TVEyes subscriber ever used any of the 22 clips downloaded from the Works as a "competing substitute" for footage licensed by Fox—indeed, Fox has not identified a single lost license. [1st.Rose.Decl. ¶¶2-3; Karle.Rep. ¶114]. Finally, TVEyes' downloading function does not drive "significant" traffic away from Fox's website, because, as noted, the Fox site cannot be used to effectively conduct research on FNC or FBN content; and in any event, the video segments posted to the Fox site cannot be downloaded. *See supra* 50-51.

The district court made no reference to any actual market harm to Fox stemming from TVEyes' downloading function, but merely hypothesized that this

---

[4th.Seltzer.Decl.¶¶5-11] Given the enormous volume of consumer traffic to its website ([Villar.Decl. ¶¶21-22 & Ex.7)], Fox cannot plausibly claim that it has suffered legally cognizable market harm from its pure speculation that so few people *might* have otherwise visited Fox's website to view the same content—even if those clips were included within the 16% of its broadcast content that Fox made available online.

function "poses undue danger to content-owners' copyrights." [Aug.2015.Op.16]. But factually unsupported speculation and fears about "dangers" are not enough, *see Sony*, 464 U.S. at 453-54, particularly in light of the dearth of evidence that any of the 21 clips downloaded from the Works resulted in any adverse effect to Fox. [Karle.Rep. ¶¶39, 90, 93].

### 3.     Date/Time-Search Function

Likewise, the record shows no market harm to Fox from TVEyes' date/time-search function. The district court was correct in initially finding that "the evidence shows that this feature does not pose any threat of market harm to Fox." [Sept.2014.Op.27]. While the district court later mused ([Aug.2015.Op.18]) that this function may "cannibalize Fox News website traffic and sales by its licensing agents" and that a subscriber "should be able to procure the desired clip from [Fox] or its licensing agents … for a fee," those suggestions are incorrect.

Because locating clips through a date/time search is done for research purposes, as with all TVEyes functions, it is a transformative use. *See supra* Part I.A.3. That transformation negates any likelihood of market harm to Fox. Fox does not make money from the research uses TVEyes facilitates through functions like date/time searching. For example, Fox prohibits use of licensed clips "derogatory to or critical of" Fox, ███████████████████████. *See supra* 44-45. In other words, subscribers cannot "procure the desired clip … for a fee" ([Aug.2015.Op.18]) because

they are contractually precluded from using any such clips in connection with research critical of Fox.  In any event, where a use is transformative, no license is required. *Campbell*, 510 U.S. at 592*; Bill Graham*, 448 F.3d at 615.

### 4.    The E-mailing, Downloading And Date/Time-Search Functions Provide Important Public Benefits

Even if this Court were to find in the record below some basis to infer possible market harm to Fox from TVEyes' e-mailing, downloading and date/time-search functions, any such effect would be outweighed by the public benefit these functions bestow by enhancing the public's ability to research, analyze and comment on news disseminated by Fox.  *See supra* [Sept.2014.Op.25-26; Aug.2015.Op.10].  Without functions that facilitate research on previously-aired content, the information necessary to conduct commentary, criticism, and analysis would be greatly restricted.

TVEyes' e-mailing, downloading, and date/time-search functions also serve the public interest by facilitating access to news *made* by Fox.  The manner in which Fox reports news often constitutes news in its own right, separate and distinct from the underlying news being reported.  In other words, Fox does not merely report the news, often its editorial and reporting decisions *are* the news.  *See*, *e.g.*, [1st.Rose.Decl ¶¶26-27, Exs.VV-WW].  This is true of the Works themselves:  several representations made in the Works were newsworthy enough to be reported by other news outlets, independent of the underlying story.  *See*, *e.g.*, [1st.Rose.Decl. ¶14 & Ex. JJ].

For all the above reasons, the district court erred in finding TVEyes' e-mailing, downloading and date/time-search functions not to constitute fair uses.

## II. UNDER *CABLEVISION*, TVEYES IS NOT LIABLE FOR DIRECT COPYRIGHT INFRINGEMENT

The district court independently erred in skipping over the issue of whether Fox proved that TVEyes was liable as a direct infringer, erroneously presuming that an absence of fair use requires a finding of infringement.[14] Fair use, however, is a defense; its absence does not absolve Fox of its burden to prove every element of direct infringement, including sufficient volitional conduct by TVEyes.[15]

There is no dispute that "volitional conduct is an important element of direct liability." *Cablevision*, 536 F.3d at 131; *see also*, *e.g.*, *In re AutoHop Litig.*, No. 12-cv-4155, 2013 WL 5477495, at *5 (S.D.N.Y. Oct. 1, 2013) ("[A] person or entity cannot be found directly liable for copyright infringement without proof of some volitional act by the person that constitutes or causes the infringement"); *Wolk v. Kodak Imaging Network, Inc.*, 840 F. Supp. 2d 724, 742 (S.D.N.Y. 2012) ("Direct

---

[14] The district court's holding that Fox proved TVEyes' volitional conduct is opaque at best. When it ruled that the e-mailing, downloading and date/time-search functions are not fair uses, it improperly assumed that liability automatically followed. *See* [Aug.2015.Op.19] (asking parties to propose "an appropriate decree" and advise on damages). Thus, to the extent that the court's August 2015 fair-use decision included an implicit summary judgment on liability for direct copyright infringement, that ruling is reviewed *de novo*, construing the record in TVEyes' favor.

[15] *See Cablevision*, 536 F.3d at 124 (no volitional conduct, even though defendants "waived any defense based on fair use").

liability requires 'volitional conduct' that 'causes' the infringement.").[16]  In most copyright cases, the question of *who* made the allegedly infringing copy or performance is not in dispute.  But "[w]hen there is a dispute as to the author" of an allegedly infringing copy, courts look to "the volitional conduct that causes the [infringing] copy to be made" in order to correctly determine direct liability. *Cablevision*, 536 F.3d at 131.

In *Cablevision*, defendant Cablevision offered a "Remote Storage Digital Video Recorder" system ("RS-DVR") that enabled cable subscribers to select the television programs to be copied (using Cablevision software) onto hard drives maintained by Cablevision at a remote location, to be played back later.  *Id.* at 124.  Specifically, Cablevision created a second, unauthorized television stream from a licensed stream, reformatted it, made buffer copies, and then, at a customer's request, saved a copy of a specific program on its server.  While Cablevision had a license to provide the underlying television content to its subscribers in real time, it did *not* have a license to

---

[16]  Every circuit to consider the issue has held that volitional conduct is required to find direct liability.  *See*, *e.g.*, *Fox Broad. Co. v. Dish Network L.L.C.*, 747 F.3d 1060, 1066-68 (9th Cir. 2014); *Parker v. Google, Inc.*, 242 F. App'x 833, 836-37 (3d Cir. 2007); *CoStar Grp., Inc. v. LoopNet, Inc.*, 373 F.3d 544, 549-50 (4th Cir. 2004). Many district courts  in other circuits are in accord.  *See*, *e.g.*, *Hearst Stations Inc. v. Aereo, Inc.*, 977 F. Supp. 2d 32, 39 (D. Mass. 2013); *Flava Works, Inc. v. Gunter*, No. 10-cv-6517, 2011 WL 1791557, at *2-3 (N.D. Ill. May 10, 2011); *Disney Enters., Inc. v. Hotfile Corp.*, 798 F. Supp. 2d 1303, 1308-10 (S.D. Fla. 2011); *Marobie-FL, Inc. v. Nat'l Ass'n of Fire Equip. Distribs.*, 983 F. Supp. 1167, 1178 (N.D. Ill 1997); *Playboy Enters., Inc. v. Russ Hardenburgh, Inc.*, 982 F. Supp. 503, 512 (N.D. Ohio 1997).

make copies of that content at users' request via its RS-DVR feature, store those copies on its servers or allow customers to play back and view those copies. The plaintiffs, owners of the copyrighted programs, brought a claim of direct—but not secondary—copyright infringement against Cablevision for offering this service.

This Court held that Cablevision was not directly liable for copyright infringement because it was Cablevision's *customers*, not the service itself, who engaged in the volitional act of requesting, making and playing the copies at issue. As the Court explained, "volitional conduct is an important element of direct liability," and "Cablevision's conduct in designing, housing, and maintaining a system that exists only to produce a copy" was not sufficiently proximate to the customer's copying to hold Cablevision liable as a direct infringer. *Id.* at 131. Rather, Cablevision merely sold "access to a system that automatically produces copies on command." *Id.* at 132. Any potential recourse against such a service provider must be based on principles of secondary liability, such as contributory liability. *Id.* at 133 ("[T]he Supreme Court has strongly signaled its intent to use the doctrine of contributory infringement, not direct infringement to 'identify[] the circumstances in which it is just to hold one individual accountable for the actions of another.'" (quoting *Sony*, 464 U.S. at 435)).

Under *Cablevision*, TVEyes cannot be directly liable for any unauthorized copies of clips from the Works made by subscribers' use of the e-mailing,

downloading, or date/time-search functions, as those copies would be entirely user-initiated and created through automated tools. *See*, *e.g.*, [1st.Seltzer.Decl. ¶¶ 3, 5, 27-29, 42-43]. The operation and use of these functions requires no volitional conduct on the part of TVEyes—TVEyes does not select or curate the clips that subscribers may e-mail, download or locate via date/time searches. TVEyes does, of course, initially capture broadcast content, which the district court (like this Court in *Google*) found to be a fair use for purposes of creating an electronic research database. The only relevant inquiry under *Cablevision* as to any *subsequent* copies made from that database, whether by e-mailing, downloading, date/time searching (or even viewing or archiving), is whether TVEyes exhibits its *own* volitional conduct as to the copies generated by subscribers. Quite simply, it does not; any such volition belongs to TVEyes' subscribers.[17] This Court should therefore find that Fox has failed to establish a required element of direct infringement as to the e-mailing, downloading

---

[17]  The district court's citation ([Nov.2015.Op.2]) to *American Broadcast Companies, Inc. v. Aereo, Inc*., 134 S. Ct. 2498 (2014) is misplaced because, *inter alia*, *Aereo*'s scope was limited to companies that provide services akin to "community antenna television," which TVEyes unquestionably does not. *Id.* at 2504, 2507, 2510; *see also* [Sept.2014.Op.24] ("No reasonable juror could find that people are using TVEyes as a substitute for watching Fox News broadcasts on television.").

and date/time-search functions, and reverse and direct entry of dismissal of Fox's remaining copyright claims.[18]

## III. THE DISTRICT COURT ABUSED ITS DISCRETION IN ISSUING A PERMANENT INJUNCTION

In addition to wrongly presuming that TVEyes' e-mailing, downloading, and date/time-search functions are automatically infringing, *see supra* Part II, the district court also wrongly presumed that Fox was automatically entitled to a permanent injunction, instructing the parties to "suggest an appropriate decree." [Aug.2015.Op.19]. The court's subsequent issuance of an injunction, and its scope, were an abuse of discretion.

### A. The District Court Failed To Consider The *eBay* Factors

"An injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010). In *eBay*, the Supreme Court reiterated the traditional four-part equitable test, holding that a plaintiff seeking a permanent injunction has the burden of proving that: (1) it has suffered an irreparable injury; (2) remedies available at law are inadequate; (3) the balance of hardships favors injunctive relief; and (4) the public interest would not be disserved by an injunction. 547 U.S. at 391. The plaintiff

---

[18] Like the plaintiff in *Cablevision*, Fox asserts only a claim of direct infringement against TVEyes, and has expressly disavowed any claim of secondary liability. *See* [Dkt.148(Fox.SJ.Opp.Br.).at.67] ("Fox News has brought a direct infringement, not secondary liability, claim against TVEyes.").

56

"must satisfy [the] four-factor test before a court may grant such relief." *Id.* Even where a plaintiff satisfies all four factors (as it must), the district court may still deny injunctive relief. *Christopher Phelps & Assocs., LLC v. Galloway*, 492 F.3d 532, 543 (4th Cir. 2007). *eBay* applies to copyright cases. *Salinger v. Colting*, 607 F.3d 68, 77-78 & n.7 (2d Cir. 2010).

Here, the district court abused its discretion because it did not apply the *eBay* factors, nor make any factual findings as to them, nor even mention them. The permanent injunction therefore should be vacated. *See Ecolab, Inc. v. FMC Corp.*, 569 F.3d 1335, 1352 (Fed. Cir. 2009) ("[T]he district court failed to consider any of the *eBay* factors and failed to make any factual findings regarding those factors. That is an abuse of discretion.").

### B.   Fox Cannot Satisfy The *eBay* Test

Because the record is devoid of any factual evidence supporting issuance of an injunction under the *eBay* factors, the Court should instead vacate the injunction order without any remand. *See, e.g., Apple Inc. v. Samsung Elecs. Co.*, 695 F.3d 1370, 1376-77 (Fed. Cir. 2012) (evidence in record "too tenuous to support a finding of irreparable harm").

*First*, Fox introduced no factual evidence of nonspeculative, irreparable harm caused by the e-mailing, downloading and date/time-search functions. *See Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002) (harm cannot be "speculative"); *Herb*

57

*Reed Enters., LLC v. Fla. Entm't. Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013) ("unsupported and conclusory statements regarding harm [the plaintiff] *might* suffer" insufficient); *Caldwell Mfg. Co. N. Am., LLC v. Amesbury Grp., Inc.*, No. 11-cv-6183, 2011 WL 3555833, at *3 (W.D.N.Y. Aug. 11, 2011) (mere "possibility" of harm "without actual proof" insufficient); *cf. Salinger*, 607 F.3d at 82 (court cannot presume irreparable harm from infringement). All of the district court's rulings on any purported harm were premised on sheer speculation. [Aug.2015.Op.14 (e-mailing: "potential" for actual harm); Aug.2015.Op.16 (downloading: "danger"); Aug.2015.Op.18 (date/time searching: "risks"). Fox's five-year delay in bringing suit ([2d.Anten.Decl.Ex.YYY; 2d.Anten.Decl.Ex.UUU; Schapiro.Decl. ¶¶48-51]) reinforces the absence of such harm. *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 134 S. Ct. 1962, 1978 (2014) (court "may take account of [plaintiff's] delay in commencing suit" in considering injunctive relief).

*Second*, monetary remedies are available at law and adequate to compensate any actual harm that might be proved. For example, any alleged lost licenses or advertising views, if found actual rather than speculative, are necessarily quantifiable. *See* 4 NIMMER ON COPYRIGHT § 14.06(B)(1)(c)(ii) (adequate remedy at law "[g]iven the ease of computing" lost licensing fees).

*Third*, the balance of hardships favors TVEyes. The enjoining of e-mailing, downloading, or date/time searching unnecessarily jeopardizes TVEyes' business

model by not allowing it to offer essential research tools to subscribers.   By contrast, there is no hardship visited upon Fox by denying injunctive relief, given both the minimal (if any) effect on Fox's market revenues and the fact that similar services approved by Fox permit even broader functionality, *see supra* 48 (discussing TV News Archive).

*Fourth*, the public interest in research, commentary and criticism would be disserved by an injunction.  "The public's interest in free expression … is significant and is distinct from the parties' speech interests." *Salinger*, 607 F.3d at 82.  Because TVEyes' e-mailing, downloading and date/time-search functions can be, and are, used in a significant, non-infringing manner to research and analyze clips from one of the nation's leading television news sources, the public interest outweighs any copyright interest Fox may have in this specific news content.  *Cf. Apple Inc. v. Samsung Elecs. Co.*, 735 F.3d 1352, 1372-73 (Fed. Cir. 2013).

### C.    The Injunction Is Overbroad

Even if this Court determines that an injunction could properly issue in this case (it cannot), the district court's injunction should be vacated as improperly overbroad, as it extends to any and all conceivable future Fox programming, rather than limited to the 19 Works.  [Nov.2015.Op.3].  An injunction must "be narrowly tailored to fit specific legal violations" and "should not impose unnecessary burdens on lawful

activity." *Waldman Publ'g Co. v. Landoll*, Inc., 43 F.3d 775, 785 (2d Cir. 1994).[19]

The district court recognized that significant uses of TVEyes' e-mailing, downloading and date/time-search functions may be fair. [*E.g.*, Aug.2015.Op.14]. To sufficiently tailor any relief to the facts presented requires case-by-case fair-use analysis; the court's categorical injunction applicable to Fox's entire 24-hour programming on FNC and FBN, including broadcasts yet to be made, is thus facially overbroad.

## CONCLUSION

The judgment below should be reversed and the injunction against TVEyes' e-mailing, downloading and date/time-search functions should be vacated.

Dated:  March 16, 2016

Respectfully submitted,

/s/ Kathleen M. Sullivan
Kathleen M. Sullivan
Todd Anten
Jessica A. Rose
QUINN EMANUEL URQUHART &
   SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY  10010
(212) 849-7000

---

[19] *See*, *e.g.*, *Chi. Bd. of Educ. v. Substance, Inc.*, 354 F.3d 624, 632 (7th Cir. 2003) (vacating "overbroad" injunction that extended to "all other examinations that the school board may someday create"); *Beastie Boys v. Monster Energy Co.*, 87 F. Supp. 3d 672, 680 (S.D.N.Y. 2015) (denying "highly overbroad" injunction because it "would sweep well beyond the single video at issue in this lawsuit" to include potential "lawful uses of the Beastie Boys' music").

Thomas C. Rubin
QUINN EMANUEL URQUHART &
   SULLIVAN, LLP
600 University Street
Suite 2800
Seattle, WA 98101
(206) 905-7000

*Attorneys for Defendant-Appellant-
Cross-Appellee TVEyes, Inc.*

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 13,439 words (based on the Microsoft Word word-count function) excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionately spaced typeface using **Microsoft Word** in **Times New Roman, 14-point type**.

Dated:          March 16, 2016

/s/ Kathleen M. Sullivan
Kathleen M. Sullivan
QUINN EMANUEL URQUHART &
   SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010

*Attorney for Defendant-Appellant-Cross-Appellee TVEyes, Inc.*